UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

UNITED STATES OF AMERICA       CASE NO. 3:25-CR-00026-01

VERSUS       JUDGE TERRY A. DOUGHTY

BOB GILBERT, JR. (01)       MAG. JUDGE KAYLA D. MCCLUSKY

<u>REPORT AND RECOMMENDATION</u>

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 34] filed by Defendant Bob Gilbert, Jr.   For reasons stated below, IT IS RECOMMENDED that the motion be DENIED.

<u>Background</u>

On May 31, 2024, at approximately 7:30 p.m., Ouachita Parish Sheriff deputies Garrett Peters and Seth Evans were on patrol in Bawcomville, Louisiana, when they spotted a dark gray Nissan Maxima with an expired temporary tag.   The deputies initiated a traffic stop, encountering the driver of the Maxima and its lone occupant, Andy Bob Gilbert.   The deputies recognized Gilbert from prior drug investigations and from information recently provided by confidential sources that he had been selling and using illegal narcotics at 100 Dixie Drive in West Monroe.   With their suspicions aroused, the deputies asked Gilbert's permission to search the vehicle, but he declined.   In response, the deputies summoned a K-9 that alerted to the presence of narcotics inside the vehicle.   The deputies, assisted by others, proceeded to search the Maxima eventually finding approximately 50 grams of methamphetamine and over 200 suspected Xanax pills hidden inside the armrest of the driver's side door.   The deputies placed Gilbert under arrest.

Meanwhile, other deputies went to 100 Dixie Drive where they conducted a knock and talk with Gilbert's ex-girlfriend, Kayla Hosea.   Hosea met the deputies on the front porch of the residence.   During their conversation, the deputes asked for consent to search the home multiple times, but Hosea declined.   The deputies then conducted a protective sweep of the home, during which they observed a methamphetamine bong sitting on the shelf in the closet of the master bedroom.

With this discovery, Deputy Peters applied for and obtained a search warrant for 100 Dixie Drive.   In the ensuing search, deputies found a .22 caliber, Single-Six Ruger revolver; a .380 caliber, 22 Glock pistol; an upper receiver to an AR-15; rifle magazines; a glass smoking pipe; a digital scale; used needles; and 9 mm rounds of ammunition.   Further, in a shed behind the residence, deputies recovered a multi-caliber, AM-15, Anderson Arms rifle, and an antique firearm.

On February 5, 2025, a federal grand jury returned a two-count indictment against Gilbert for possession with intent to distribute methamphetamine in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii) and possession of firearms and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).   The indictment also included forfeiture allegations. Gilbert was arraigned on February 11, 2025, and entered a plea of not guilty as to both counts. (Minutes [doc. # 18]).

On July 8, 2025, Gilbert filed the instant motion to suppress.   [doc. # 34].   The Government filed its response and a supplemental response on July 16 and August 11, 2025, respectively.   [doc. # 35 & 37].

2

A hearing was held on August 20, 2025, where the Court heard testimony from two Government witnesses:  Garrett Peters ("Deputy Peters" or "Peters")[1] and Justin Purvis ("Deputy Purvis" or "Purvis")[2].  (Witness List [doc. # 39]).  The Court also received into evidence six exhibits from the Government:

1) Still image of the Maxima from Deputy Peters' body camera;

2) May 31, 2024 video and audio footage from Deputy Peters' body camera;

3) Photograph of an open container in the Maxima;

7) May 31, 2024 application and search warrant for 100 Dixie Drive, West Monroe;

8) May 31, 2024 video and audio footage from Deputy Purvis's body camera; and

9) Still image of drug paraphernalia in the closet;

plus two exhibits from Defendant:

1) Ouachita Parish Sheriff offense report; and

2) Affidavit for search warrant by Deputy Peters.

(Gov.'t Exhibit List [doc. # 40]); (Def. Exhibit List [doc. # 41]).

A transcript of the hearing was filed in the record on September 15, 2025.  (Transcript [doc.# 42] (hereinafter, cited as "Tr.," together with the corresponding page number).

---

[1] Deputy Peters worked for the Ouachita Parish Sheriff's office ("OPSO") from February 2021 until October 2024 when he was hired by the Louisiana State Police.  (Tr. 4).  While at the OPSO, Peters was assigned to corrections, patrol, SWAT, and the Special Crimes Apprehension Team ("SCAT").  *Id*.  He began work for SCAT in May 2024.  *Id*.  As a SCAT member, his duties included narcotics and firearms investigations.  *Id*.

[2] Deputy Purvis has worked for the OPSO since 2018.  (Tr. 57-58).  He started in patrol before transitioning to SCAT in 2020.  *Id*.  Before joining the OPSO, Purvis worked for the Madison Parish Sheriff for six and one-half years.  *Id*.

The parties filed post-hearing briefs on October 10 and 23, 2025.   [doc. #s 45-46].

Accordingly, the matter is ripe.

## Relevant Testimony and Evidence

### I.    The Traffic Stop

On May 31, 2024, at approximately 7:30 p.m., Deputy Peters, accompanied by fellow

OPSO deputy, Seth Evans ("Evans" or "Deputy Evans"), were patrolling in the Bawcomville

area of Ouachita Parish, when Peters observed a dark gray Nissan Maxima with a temporary

dealership tag that had expired on May 25, 2025.   (Tr. 5-8).[3]   Accordingly, Peters turned his

vehicle around and activated his lights to conduct a traffic stop for the expired paper tag.   (Tr. 8).

At the time that he initiated the stop, Peters did not know that the Maxima's driver, and its lone

occupant, was Bob Andy Gilbert ("Gilbert").   (Tr. 8-9).

Footage from Peters' body camera depicts him approaching the driver's side window of

the Maxima approximately one minute after the camera was activated.   (Peters Body Cam.;

Gov.'t Exh. 2; 1:00).   Peters noted to Gilbert that he had a dealer tag and asked him whether he

had registered the car yet; Gilbert replied that he had not.   *Id.*, 1:12.   Peters then asked Gilbert

for his driver's license, but Gilbert replied that he did not have it on him.   *Id.*   Peters then asked

Gilbert his name, and he replied, Bob Andy Gilbert.   *Id.*, 1:19.   Peters knew of Gilbert because,

weeks earlier, SCAT had received anonymous calls concerning the sale of narcotics by Gilbert at

---

[3]  At that time, Peters and Evans were stationary on the corner of Sandal Street and Evergreen
Street.   *Id.*

100 Dixie Drive.[4]   (Tr. 10-11).   In fact, deputies previously had attempted a knock and talk at 100 Dixie Drive, but no one had answered the door.   *Id.*

Approximately thirty seconds into the stop, Peters radioed dispatch with Gilbert's name and description.   *Id.*, 1:28.   Peters also observed an open container of Michelob Ultra beer in one of the cup holders in the center console.   (Tr. 12); *see also* Gov.'t Exh. 3.

Dispatch advised Peters that Gilbert had a failure to appear traffic ticket from the West Monroe Police Department with a $1,000 bond.   (Tr. 11-12).   One minute and fifteen seconds into the stop, Gilbert opened the door and exited the car.   (Peters Body Cam., 2:15).   As he stepped out of the car, Deputy Peters asked Gilbert if he had any weapons on him and asked whether he minded if he patted him down for weapons.   *Id.*   After patting him down, Peters asked Gilbert to step to the rear of the vehicle where Deputy Evans engaged with him.   *Id.*, 2:35.

Deputy Evans told Gilbert that he was acting "awfully nervous."   *Id.*, 2:40.   Peters also testified that Gilbert appeared nervous and was trembling as he spoke.   (Tr. 13).   Evans asked Gilbert whether there was anything in the car that was going to get him in trouble.   (Peters Body Cam., 2:45).   Peters then chimed in and asked Gilbert whether he was nervous because of the open container.   *Id.*, 2:50.   Evans explained to Gilbert that if that was all it was, they were not worried about that.   *Id.*, 2:55.

Evans then asked Gilbert whether he minded if they searched the car.   *Id.*, 3:00.   After mulling it over for a few seconds, Gilbert declined to give permission to search the car.   *Id.*, 3:08.   Peters then walked away and muted his microphone.   *Id.*, 3:20.   At the hearing, Peters

---

[4] A neighbor had also told Deputy Colby Ainsworth that Gilbert's son had a gun and was using drugs at the house.   (Tr. 77-78).

explained that he called his supervisor to explain what was going on.  (Tr. 15).  Peters also asked dispatch whether there was a dog available.  (Peters Body Cam., 3:54).

One minute later, Peters walked back to where Gilbert was standing and asked whether he had any information on the car.  *Id.*, 4:54.  Gilbert replied that he had registration and insurance.  *Id.*  Gilbert retrieved a registration certificate and explained that the car still was registered to his girlfriend.  *Id.*, 5:28.  Gilbert and Peters discussed that Gilbert was taking the car over from his girlfriend and had not yet completed the title work.  *Id.*, 5:34.  Peters returned to his unit.  *Id.*, 6:19.

The foregoing circumstances further raised Peters' suspicions because the paper tag on the vehicle was purportedly issued by a dealer, but in a person-to-person transaction, a dealer tag is not issued.  (Tr. 17).  Peters stated that Gilbert admitted that he had forged the tag to buy him some time to register the car.  *Id.*  He also testified that paper tags were consistent with drug trafficking because a license plate reveals a lot of information that drug traffickers do not want disclosed.  (Tr. 54).

After moving his unit so he would not have to walk through a puddle every time he entered and exited the vehicle, Peters inputted data into a handheld electronic ticket writer.  (Peters Body Cam., 7:04).  Peters then returned to the hood area of the Maxima to compare the VIN from the dashboard with the VIN on the registration certificate.  *Id.*, 7:47.  He also tried to find the VIN on the door frame.  *Id.*

Peters returned to his unit and called the VIN into dispatch.  *Id.*, 8:43.  Dispatch quickly confirmed that the car was registered to Kayla Hosea at 320 Oaklawn Drive, West Monroe,

6

Louisiana.  *Id.*, 9:06.  Peters then proceeded to input more data into his handheld electronic ticket writer  *Id.*, 10:15; Tr. 18.

Over nine minutes into the stop, Peters stepped out and asked Gilbert his address.  *Id.*, 10:25.  Gilbert gave his address as 100 Dixie Lane, West Monroe, Louisiana.  *Id.*  Peters explained at the hearing that, since Gilbert did not have any identification, he needed his address so he could issue a citation.  (Tr. 19).  A short while later, a mechanical voice is heard, likely from Deputy Peters' laptop, stating "license suspended."  *Id.*, 10:53.  Peters continued to input more data into his electronic ticket writer.  *Id.*  He then scanned the registration certificate with his handheld device.  *Id.*, 11:42.  Peters walked back to the Maxima and scanned the VIN on the door frame, before retreating to his unit to continue inputting still more data into the electronic ticket writer.  *Id.*, 12:10-12:39.

Thirteen minutes and fifteen seconds after Peters first approached the stopped Maxima, Captain Freeland of the West Monroe Police Department arrived with a K-9.  *Id.*, 14:15; Tr. 19-20.  Peters testified that, at the time Freeland arrived, he still was trying to populate the citation.  (Tr. 21).  In fact, during this entire period, Peters was working to complete the citation.  *Id.*

After talking to Captain Freeland for over one minute, Peters returned to his unit.  (Peters Body Cam., 15:19).  The K-9 conducted an open-air sniff of the Maxima, whereupon Freeland advised Peters that the dog had given a positive alert to the odor of narcotics.  (Tr. 21; Peters Body Cam., 17:05).  Deputies Peters and Evans commenced to search the Maxima.  *Id*.  Additional deputies joined in the search.  (Tr. 21).

Deputies first located a scale with some narcotics residue on it and then an empty 35-round .22 magazine, plus a live 9-millimeter round.  (Tr. 22).  Peters also found a small zipper

7

pouch that contained several thousand dollars.  *Id.*  Once the scale was found, deputies advised Gilbert of his *Miranda* rights.  *Id.*, 24:56; Tr. 22.  In due course, deputies uncovered 48.4 grams of Xanax and 46.25 grams of suspected methamphetamine hidden in the driver's side door armrest.  (Peters Body Cam., 39.00, 41:49 and Tr. 24-25).  Peters testified that Gilbert admitted that he was aware of the Xanax but denied knowledge of the methamphetamine.  (Tr. 25).  The deputies placed Gilbert under arrest.  *Id*.  Peters completed the still-unfinished traffic ticket for Gilbert.  (Peters Body Cam., 1:00:00; Tr. 25-26).  Peters then drove to Metro Narcotics with Gilbert.  (Tr. 25).

**II.    100 Dixie Drive**

As Peters was concluding the investigation at the scene of the traffic stop, Deputy Purvis, OPSO Sergeant Thompson, and OPSO Deputy Stocket traveled to 100 Dixie Drive, West Monroe, Louisiana where they encountered Kayla Hosea ("Hosea") in the doorway of the front porch.  *See* Purvis Body Cam.; Gov.'t Exh. 8; Tr. 59.  Hosea told the deputies that she lived there with her kids.  (Purvis Body Cam.).  She said that Bob Gilbert stayed there occasionally, but not a lot.  *Id*.  Hosea fully exited the home and closed the front door behind her.  *Id*.

Hosea said she thought that Gilbert lived in Columbia with his mother and that she and Gilbert were no longer were together  *Id*.  She explained to the deputies that Gilbert was not living there at all and that she had not seen him in a few days.  *Id*.  However, he still had some stuff there from when they were dating.  *Id*.  His son's vehicle was also there because it had been broken down for about one month.  *Id*.

Hosea told the deputies that her parents and kids were inside and that she did not want the deputies to search the house.  *Id*.  Deputies told Hosea that she appeared scared and her voice

was cracking.  *Id.*  Hosea's mother opened the door and stepped outside.  *Id.*, 6:13.  Deputy Purvis told Hosea that he would bet his entire paycheck that there was "dope" in the house.  *Id.* Hosea reiterated that her stepdad and daughter were still in the house.  *Id.*  She protested that Gilbert should not have anything there because they had broken up a few days earlier.  *Id.*, 9:54.

Sergeant Thompson advised Hosea that he was going to submit for a search warrant for the residence.  *Id.*, 10:50.  In the meantime, he said that he was going to go inside and make sure there were "no hidden bodies," just her Dad and daughter.  *Id.*  He further explained that he was going to ensure that there was no one else in the rooms.  *Id.*  Sergeant Thompson added that it was time for Hosea to be honest with him.  *Id.*  Hosea then disclosed that she thought there was some weed in "Gabe's car."  *Id.*, 11:38.  Deputy Purvis testified that a gesture made by Hosea several minutes earlier signaled her invitation for deputies to conduct a protective sweep.  (Tr. 61, 89).  He admitted, however, that she never consented to a search of the home. (Tr. 61-62, 88-89).

The deputies proceeded to enter the home.  (Purvis Body Cam., 12:40).  Their firearms were not drawn, which Purvis stated was not uncommon during a protective sweep.  (Tr. 82-83). Thompson encountered Hosea's stepdad and kept him company while Deputy Purvis started clearing the rooms.  (Purvis Body Cam.).  Purvis looked in the rooms, closets, and under the beds.  *Id.*  As he glanced into the master bedroom closet, he observed a methamphetamine bong in plain view on the shelf.  (Tr. 63-64; Gov.'t Exh. 9 (still image depicting the bong)).  The sweep lasted one minute and forty-five seconds.  (Tr. 63).

Following the protective sweep, Lieutenant Wiles placed a call to Deputy Peters and advised him that they had observed a glass bong consistent with narcotics use at 100 Dixie Drive

and that someone had advised deputies that a vehicle parked at the residence contained

marijuana.   (Tr. 27).   Accordingly, Peters drafted and submitted a search warrant application for

100 Dixie Drive.   (Tr. 27; Gov.'t Exh. 7).   Peters stated in the application that,

> [f]or several weeks, OPSO SCAT has received several anonymous tips from
> confidential sources stating Bob Gilbert, Jr. was selling and or using illegal
> narcotics at 100 Dixie Drive in West Monroe, Louisiana.   The tips further stated
> Bob was possessing firearms along with the narcotics as well as a drug pill press
> used for manufacturing narcotics.   On May 31st, 2024, OPSO SCAT Deputies
> conducted a traffic stop on a vehicle for traffic violations.   The driver, Bob Gilbert,
> Jr. was found to be in possession of a large quantity of Xanax, a large quantity of
> Methamphetamine, and a large quantity of US currency.   Bob stated to Deputies
> he currently resides at 100 Dixie Drive.
>
> Additional OPSO SCAT Deputies arrived at 100 Dixie Drive to continue the
> investigation.   Deputies were invited inside by the homeowner.   While
> conducting a protective sweep of the residence, Deputies observed in plain view a
> glass bong used for smoking Methamphetamine inside the master bedroom.
> Furthermore, the owner of the residence advised Deputies she believes the dark
> gray Dodge Charger outside the residence contains Marijuana.
>
> Deputies requested but were denied consent to search the residence by the owner.

(Search Warrant Application; Gov.'t Exh. 7).

At 9:28 p.m. on May 31, 2024, the Honorable Fred Jones of the Fourth Judicial District

Court for the Parish of Ouachita, State of Louisiana, issued a search warrant for 100 Dixie Drive.

*Id*.

In the ensuing search of the home, deputies found drug paraphernalia, firearms, and

ammunition.   (Tr. 65).

## Law and Analysis

## I.    Fourth Amendment Principles

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures." U.S. CONST. AMEND. IV.[5]   The protections of the Fourth Amendment extend to

the states through the Fourteenth Amendment.   *Dunaway v. New York*, 442 U.S. 200, 207

(1979).   "A defendant normally bears the burden of proving by a preponderance of the evidence

that the challenged search or seizure was unconstitutional.   However, where a police officer acts

without a warrant, the government bears the burden of proving that the search was valid."

*United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted).

Generally, "evidence obtained in violation of the Fourth Amendment cannot be used in a

criminal proceeding against the victim of the illegal search or seizure.   This prohibition applies

as well to the fruits of the illegally seized evidence."   *United States v. Wallace*, 885 F.3d 806,

810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).   The

purpose of this exclusionary rule is to deter unlawful police conduct:   by refusing to admit

evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope

to instill in those particular investigating officers, or in their future counterparts, a greater degree

of care toward the rights of the accused."   *United States v. Pope*, 467 F.3d 912, 916 (5th Cir.

2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).   However, the exclusionary

rule is not without limits and suppression of evidence should be "ordered only on a case-by-case

---

[5] In his initial brief, Gilbert cited at least one Louisiana state court decision.   *See* M/Suppress,
pg. 5 n.5-6 [doc. # 34].   It is manifest, however, that "[t]he question that a federal court must ask
when state officials secure evidence to be used against a defendant accused of a federal offense is
whether the actions of the state officials violated the Fourth Amendment of the United States
Constitution."   *United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) (quoting *United States
v. Walker,* 960 F.2d 409, 415 (5th Cir. 1992) (internal quotation marks omitted).   Therefore,
"[w]hether the Fourth Amendment has been violated is determined solely by looking to federal
law on the subject."   *Walker*, 960 F.2d at 415-16; *United States v. Guerrero*, 500 F. App'x 263,
265 (5th Cir. 2012).

basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*

## II.    The Stop and Detention

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations and internal quotation marks omitted).   A traffic stop constitutes a seizure under the Fourth Amendment, and its legality is analyzed under the framework set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).   *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citations omitted); *see also Brendlin*, 551 U.S. at 555 (a traffic stop entails a seizure of the driver for purposes of the Fourth Amendment). *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (same).   Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops. *Brigham,* 382 F.3d at 506 (citations omitted).

A *Terry* analysis is two-tiered:   (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.   *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).

### A.    The Initial Stop

"Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit

a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).   Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity."   *Id*. (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).   To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity."   *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)).   Nonetheless, the Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence."   *Id*. (citation omitted).   The validity of the stop is determined under "the totality of the circumstances-the whole picture."   *Id*.   (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

"A police officer may stop a vehicle if he has probable cause to believe a traffic violation has occurred."   *United States v. Khanalizadeh*, 493 F.3d 479, 482 (5th Cir. 2007) (citing, *inter alia*, *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769 (1996)).   "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense."   *United States v. Zavala*, 541 F.3d 562, 575 (5th Cir. 2008) (citation omitted).   An officer has probable cause to effect a stop when he or she observes a traffic violation.   *See Khanalizadeh*, 493 F.3d at 482 (probable cause for stop where front license plate was missing).

In this case, the traffic stop was justified at its inception because Deputy Peters observed Gilbert operating the Maxima with an expired temporary tag which is a violation of Louisiana Revised Statute § 47:519.

    B.    <u>Continued Detention</u>

Under *Terry*'s second prong, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Brigham*, 382 F.3d at 507. An officer's mission during a traffic stop permits such inquiries as, "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). "During a traffic stop, a police officer may examine a driver's license and vehicle registration, [and] run a computer check on the driver and the vehicle." *Zavala*, 541 F.3d at 576. An officer "must ensure that the driver does not have a warrant or a suspended license, and that the vehicle is registered and not reported stolen. These checks are routine and quickly performed." *Id.* at 577. An officer "may also ask about the purpose and itinerary of the occupant['s] trip as part of [his] investigation," because these questions are "reasonably related in scope to his investigation of the circumstances that caused the stop." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). Furthermore, an officer may question the driver on matters unrelated to the purpose of a traffic stop, "so long as these unrelated questions do not extend the duration of the stop." *Id.*

 "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354. "Because addressing the infraction is the

purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." *Id.* (internal quotations omitted). The authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Thus, although certain unrelated inquiries that do not lengthen a roadside detention are permissible, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

"In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002). "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431 (citations omitted).

Gilbert argues that officers had no reasonable suspicion for summoning a K-9 to search the Maxima. The Court disagrees. After he initiated the stop, Deputy Peters engaged with Gilbert at the driver's side window of the Maxima and observed an opened can of Michelob Ultra beer in the center console, which constitutes a violation of Louisiana's open container law. *See* LA. R.S. § 32:300. Further, within about 20 seconds of the stop when Gilbert disclosed his name, Deputy Peters immediately recognized him because Gilbert had been the subject of anonymous complaints regarding the use and/or sale of illegal narcotics at 100 Dixie Drive. *See* Tr. 10.

Within about one minute after initiating the stop, dispatch advised Peters that Gilbert had an outstanding warrant for failure-to-appear with a $1,000 bond. (Tr. 11-12, 32). Furthermore,

Gilbert appeared nervous to Peters, not making eye contact with him, and "kind of trembling" as he spoke.   (Tr. 13).   Given Gilbert's demeanor, the outstanding warrant, the anonymous tip linking him to illicit drug use or trade, and the as-yet-unaddressed expired temporary tag, the deputies had reasonable suspicion to believe that Gilbert's vehicle contained contraband.   *See United States v. Thompson*, 783 Fed. App'x. 360, 365 (5th Cir. 2019) (defendant's nervousness, possible drug trafficking in a high-drug-crime area, and an anonymous tip provided officers with reasonable suspicion that defendant was engaged in illegal drug activity).[6]

Consequently, the deputies requested Gilbert's consent to search the vehicle.   When Gilbert declined to consent, Deputy Peters promptly called for a K-9, within four minutes of the stop.   *See United States v. Phillips*, No. 22-50745, 2024 WL 323498, at *4 (5th Cir. Jan. 29, 2024) (deputy acted diligently by calling for the dog sniff immediately after defendant refused to consent to a search of his vehicle).   The K-9 arrived within fourteen minutes after the initial stop and alerted to the presence of drugs within three minutes thereafter.   *Id*. (21-minute delay for dog to arrive was not unreasonable).

In *Rodriquez v. United States*, the Supreme Court held that the police may not "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Rodriguez v. United States*, 575 U.S. at 353.   In this case, however, not only did the deputies have reasonable suspicion to extend the stop, but the original purpose of the traffic stop still was not completed at the time the K-9 alerted to the presence of drugs.   Rather, Deputy Peters continued to investigate the traffic violations throughout the seventeen-minute period before the

---

[6] At some point after the K-9 was called, Gilbert admitted to deputies that he had a criminal history.   *See* Tr. 30, 41-42.

16

K-9 arrived and alerted.   In fact, Peters' suspicions were only heightened when he learned that

Gilbert had forged the temporary paper tag, a practice favored by drug traffickers because it

thwarted disclosure of pertinent information.   (Tr. 54).   Peters emphasized that, during this

entire period, he was working to complete the citation.   (Tr. 21).

The Court credits Peters' testimony, which is supported by his activities visually recorded

on his body camera.   The Court further finds that the deputy's actions demonstrated a

"graduated response to emerging facts, [which] were reasonable under the totality of the

circumstances, and did not unconstitutionally extend [defendant's] detention."   *United States v.*

*Pauyo*, 341 Fed. App'x. 955, 956 (5th Cir. Aug. 18, 2009) (citation omitted); *see also United*

*States v. Smith*, 952 F.3d 642, 650–51 (5th Cir. 2020) (record does not suggest that the officer

unreasonably dragged the investigation out, but, instead, was waiting on background checks).

**II.**     **Vehicle Search**

A.  Automobile Exception

It is manifest that, "searches conducted outside the judicial process, without prior

approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject

only to a few specifically established and well-delineated exceptions."   *California v. Acevedo*,

500 U.S. 565, 580 (1991).   One such exception that is "specifically established and well-

delineated" is the so-called automobile exception.   *United States v. Ross*, 456 U.S. 798, 825

(1982).   The automobile exception allows police to search a vehicle if they have probable cause

to believe that the vehicle contains contraband."   *United States v. Fields*, 456 F.3d 519, 523 (5th

Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)).   "[T]he automobile exception

does not have a separate exigency requirement:   'If a car is readily mobile and probable cause

exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)).   Probable cause to search the vehicle "depends on the totality of the circumstances viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search."   *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) (internal quotations omitted).

An alert by a trained canine provides officers with probable cause to search a car. *United States v. Sanchez–Pena*, 336 F.3d 431, 444 (5th Cir. 2003) ("We have repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search."); *United States v. Zucco*, 71 F.3d 188, 191–92 (5th Cir. 1995) (once dog alerted to the interior wall of the van, police had probable cause to dismantle the wall).   Further, "a showing of the dog's training and reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle."   *Id.*   "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825.   The search may include containers within the vehicle as long as officers "have probable cause to believe evidence or contraband is contained" inside.   *Acevedo*, 500 U.S. at 580.

Here, Deputy Peters testified that the K-9 provided a positive alert to the presence of drugs in the Maxima.   The alert provided the deputies with probable cause to search the vehicle and its contents.   Therefore, the warrantless search of the vehicle did not violate the Fourth Amendment, and the evidence seized as a result of the search should not be suppressed.[7]

---

[7] Gilbert protests that 57 minutes elapsed between the time of the traffic stop and the car being

III.    **Statements**

Gilbert urges the Court to suppress all of his responses to deputies' roadside questioning that he made prior to the time that they advised him of his *Miranda* rights, i.e., until approximately 26 minutes into the stop.   He contends that these statements should be suppressed because he made them in response to a custodial interrogation without receiving the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966).   He stresses, in particular, that his statement that he lived at 100 Dixie Lane in West Monroe should be suppressed.

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself."   U.S. CONST. AMEND. V.   In *Miranda v. Arizona*, the Supreme Court held that to safeguard this privilege against self-incrimination, law enforcement officers must advise individuals of their rights prior to a custodial interrogation.   *Miranda*, 384 U.S. at 478-79.[8]   The purpose of the *Miranda* rule is to protect against the inherent compulsion of custodial questioning.   *Dickerson v. United States*, 530 U.S. 428, 435 (2000).   A violation of *Miranda* protections can result in the exclusion of statements obtained during the interrogation. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).   Importantly, however, a "mere violation of *Miranda's* 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine." *United States v. Bengivenga*, 845 F.2d 593, 601 (5th Cir. 1988).

---

searched and narcotics seized.   However, there is "no constitutional stopwatch on traffic stops." *Brigham*, 382 F.3d at 511.

[8] These safeguards include informing the defendant "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him . . ."   *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (quoting *Miranda*, 384 U.S. at 479).

19

The Government contends that *Miranda* warnings were not required with regard to Gilbert's challenged statements because he was not subjected to custodial interrogation. Indeed, "*Miranda* protects statements made in response 'to custodial interrogation.' Thus, a defendant's statements are admissible if they are made outside of custodial interrogation." *United States v. Palmer*, 111 F.4th 588, 594 (5th Cir. 2024) (internal citations omitted). The Fifth Circuit utilizes a two-step inquiry to determine whether a custodial interrogation occurred. *United States v. Rafoi*, 60 F.4th 982, 1002 (5th Cir. 2023). "First, looking at the totality of the circumstances, the Court analyzes the defendant's freedom of movement. Next, it analyzes whether the questioning took place in an environment resembling the stationhouse questioning at issue in *Miranda.*" *Id*. (citation omitted).

"A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015). However, the Supreme Court has held that, because of the "noncoercive aspect of ordinary traffic stops . . . persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). Thus, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id*. However, "if a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he is entitled to the full panoply of protections prescribed by Miranda." *Id.*

To be sure, Gilbert was not free to leave at the time that the deputies questioned him, as the deputies had not completed the purpose of the traffic stop.   On the other hand, he was not yet handcuffed, the questioning was relatively brief, deputies were not accusatory in their questioning, and he was questioned in public, next to the road.   *See Palmer*, 111 F.4th at 594 (discussing "freedom of movement" factors).   In fact, when Deputy Peters solicited Gilbert's address, he politely apologized to Gilbert for interjecting himself into Gilbert's conversation with Evans to pose the question.   Therefore, the Court finds that a reasonable person in Gilbert's position would not have equated the restraint on his freedom of movement with that of formal arrest as required to implicate *Miranda* for his pre-arrest statements.   *See Palmer*, 111 F.4th at 594 (officers spoke with defendant for only a few minutes during a routine traffic stop on a residential street, and the officers were never accusatory or threatening).

Furthermore, under the second step of the custodial interrogation inquiry, the Court must determine "whether the relevant environment [in which Gilbert was questioned] presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Rafoi*, 60 F.4th at 1006.   Here, the deputies posed general questions about the presence of contraband in the vehicle, the temporary tag that Gilbert forged, and his biographical information.   The deputies were not confrontational and did not threaten or employ coercive tactics to elicit Gilbert's responses.   This type of questioning in a roadside traffic stop simply does not arise to the same inherently coercive pressures as the station-house-environment concerns at issue in *Miranda.   Palmer*, 111 F.4th at 595 (citation omitted).[9]   Accordingly, the Court declines to suppress Gilbert's pre-*Miranda* statements.

---

[9] In his motion, Gilbert seemed concerned principally with his statement that he resided at 100

## IV.    The Knock and Talk

Gilbert contends that after deputies effected his roadside arrest at one location, they impermissibly relocated to 100 Dixie Drive to conduct a warrantless search of the home.[10] However, the Supreme Court has recognized that, "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)).   Indeed there are good reasons for the police to approach a home before seeking a search warrant.   *King*, 563 U.S. at 466.   For example, they "may wish to speak with the occupants of a dwelling before deciding whether it is worthwhile to seek authorization for a search."   *Id*.   Alternatively, a consensual search of the home may result in considerably less inconvenience and embarrassment to the occupants than a search conducted pursuant to a warrant.   *King*, 563 U.S. at 467.   Finally, the police might wish to obtain more evidence to support what otherwise might be a marginal warrant application or to otherwise expand the scope of the warrant.   *Id*.   As a result, the "[f]ederal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."   *United States v. Torres de Lopez*,

---

Dixie.   However, ordinary biographical questions that are part of the routine booking process typically do not constitute an interrogation under *Miranda*.   *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989); *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (recognizing "routine booking question" exception to *Miranda*'s coverage).

[10] Citing *Kentucky v. King*, 563 U.S. at 463, Gilbert contends that the deputies manufactured the exigency by relocating to 100 Dixie Drive and conducting a knock and talk.   However, the protective sweep doctrine is analytically distinct from the exigent-circumstances exception at issue in *King*.   *United States v. Thurman*, No. 21-30450, 2022 WL 2805147, at *3 n.5 (5th Cir. July 18, 2022).   Moreover, it is clear that agents may conduct a protective sweep following a knock and talk.   *See* discussion, *infra*.

No. 22-50505, 2023 WL 1873088, at *1 (5th Cir. Feb. 9, 2023) (quoting *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001)).

In this case, after discovering drugs in Gilbert's Maxima, OPSO deputies proceeded to Gilbert's alleged residence, 100 Dixie Drive, to conduct a knock and talk.   Deputies had conducted a knock and talk at this residence previously, but no one had answered the door.   (Tr. 10-11).   This time, however, they encountered Hosea, who came out onto the front porch and conversed with them.   During the conversation, deputies tried their best to obtain her consent to search the home, but without success.   They then conducted a protective sweep.

## V.     The Protective Sweep

"[W]hen it comes to the Fourth Amendment, the home is first among equals.   At the Amendment's very core stands [one's] right . . . to retreat into [one's] own home and there be free from unreasonable governmental intrusion." *Jardines*, 569 U.S. at 6.   Nonetheless, one of the exceptions to the warrant requirement is the protective sweep doctrine. *United States v. Turner*, 125 F.4th 693, 708 (5th Cir. 2025) (citation omitted).   "A protective sweep is a quick and limited search of premises . . . conducted to protect the safety of police officers or others.   It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (internal quotation marks omitted).[11]   "Once the officers are legally inside the [residence], any evidence or contraband that is in plain view is subject to seizure and may be admitted into evidence." *United States v. Jackson*, 700 F.2d 181, 189 (5th Cir. 1983) (citing *Harris v. United States,* 390 U.S. 234, 236 (1968)).

---

[11] However, there is no "general security check" exception to the warrant requirement. *Kirkpatrick v. Butler*, 870 F.2d 276, 281 (5th Cir. 1989) (citation omitted).

A valid protective sweep requires the following:

First, the police must have entered legally and for a legitimate law enforcement purpose.

Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene.

Third, the protective sweep must be limited to a cursory inspection of only those spaces where a person may hide; it is not a full search of the premises.

Finally, officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

*United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008) (citing *United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004) (footnotes removed).

When assessing whether a protective sweep is justified, the court considers the totality of the circumstances surrounding the officers' actions. *United States v. Silva*, 865 F.3d 238, 241–42 (5th Cir. 2017) (citation omitted). Ultimately, however, "[i]f reasonable minds could differ on [ ] whether the sweep was warranted, [the court will] not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation." *Id.* (citation omitted).

As an initial matter, the Court rejects the deputies' contention that by making a vague sweeping arm gesture several minutes before the deputies conducted the protective sweep, Hosea impliedly invited them into her home for the purpose of conducting said sweep. *See* Tr. 88-89. Nonetheless, this determination is not fatal to the protective sweep exception to the warrant requirement because homeowner consent is not an element of the doctrine. *See, e.g., Mata*, 517 F.3d at 286 (listing four requirements).

24

Turning to the actual requirements of the exception, the Court finds that the OPSO deputies were at 100 Dixie Drive for a legitimate law enforcement purpose.  *See King*, 563 U.S. at 466.   They previously had received a tip from a neighbor that Gilbert's son had a gun and was using drugs at the house.   (Tr. 77).   Other anonymous tips had indicated that Gilbert, himself, was using or selling drugs at 100 Dixie Drive.   (Tr. 10-11).   Finally, deputies had just discovered Gilbert transporting a large quantity of drugs, and he represented that he resided at 100 Dixie Lane.

Second, prior to the sweep, deputies had a reasonable, articulable suspicion that others were in the home who posed a danger to law enforcement.   They knew that Hosea's stepdad and child were still in the house.   Moreover, they had received a tip that Gilbert's son had a gun and was using drugs at the residence, but the son remained unaccounted for.   Furthermore, they had just arrested Gilbert with a large quantity of drugs, which often go hand in hand with firearm use. *See* Tr. 75.   In addition to the drugs, deputies had found an empty .22 magazine and a live 9-millimeter round in the Maxima, which also suggested the existence of associated firearms.

Gilbert protests that, for eleven minutes, the deputies tried in vain to obtain Hosea's consent to search the house, and, only after that failed, did they elect to conduct a protective sweep.   He further emphasizes that the deputies' relaxed demeanor both on the porch and during the protective sweep was inconsistent with their subjective belief that there was someone inside the home who might pose a danger to them.   However, the deputies' individual behavior is not dispositive.

In *United States v. Thurman*, the Monroe Police Department received an anonymous tip that Thurman, a felon, was in possession of an assault rifle that he carried with him to and from

unit 74 of Parkview Apartments, where he resided with his girlfriend and her two children.   No. 21-30450, 2022 WL 2805147, at *1 (5th Cir. July 18, 2022).    Although they did not have enough information for a search warrant, officers confirmed that Thurman was a known felon and had a lengthy criminal history, so they decided to conduct a "knock and talk." *Id.*   Three children playing outside unit 74 told officers that Thurman was inside with "'somebody'" and then went to get Thurman.   *Id.*   Thurman came out "about 20 seconds later and stood right outside of the unit with the door still ajar."   *Id.*   One of the officers could smell the odor of marijuana from the apartment.   Officers spoke with Thurman for seven to eight minutes, during which time a child entered the unit and then exited again, accompanied by a woman. Thurman "nervously" denied possessing a gun and denied that the unit was "'his'" apartment, but admitted he "'frequented'" it.   *Id.*   Neither the apartment lessee nor Thurman gave police permission to search.   During the time they sought consent, a detective stood with his back to the open apartment door for minutes.   *Id.* at *4.   Based on Thurman's nervousness, evasive answers, and the possibility that others remained in the apartment, two officers conducted a protective sweep. *Id.* at *1.   Within 30 seconds of beginning the sweep, an officer observed an assault rifle propped up against a wall in the far corner of the back bedroom, a baggie of marijuana on the night table, and digital scales.   *Id.*   Officers then returned to the doorway, "but they had not yet determined that no one else was inside," so they were joined by another officer to conduct a secondary sweep, lasting approximately 30 seconds.   After clearing the bathroom and both bedrooms, the three officers exited.   In total, the sweeps lasted approximately one minute. Based on the totality of the circumstances and after consideration of the four factors, the Fifth Circuit found that the protective sweeps were "constitutionally reasonable."   *Id.* at *5.

26

While, unlike officers in *Thurman,* officers in the instant case had their firearms holstered, Sergeant Thompson went straight to Hosea's stepdad in the kitchen and engaged him, while the other deputies conducted the sweep.   Further, Deputy Purvis explained that it was not uncommon for officers to conduct a sweep with their firearms holstered.   *See* Tr. 83-84.

In addition to the closely analogous *Thurman* decision, the Fifth Circuit has upheld other protective sweeps with arguably less articulable suspicion that someone was in the home and posed a danger to officers.   In one such case, the Fifth Circuit upheld a sweep where the officer conceded that "he lacked specific reason to believe other individuals were in the house but that the possibility always exists."   *United States v. Watson*, 273 F.3d 599, 601 (5th Cir. 2001).   In another decision, the Fifth Circuit found no Fourth Amendment violation where the DEA agent conducted a security check of a motel room when the defendant was arrested outside the front door, and the agent had a reasonable, but unarticulated suspicion that someone else might have remained in the motel room.   *United States v. Sheikh*, 654 F.2d 1057, 1072 (5th Cir. 1981), *overruled on other grounds by United States v. Zuniga-Salinas*, 952 F.2d 876 (5th Cir. 1992)). Likewise, in *United States v. Jackson*, the Fifth Circuit found that agents had a reasonable belief that an immediate security sweep of the premises was required because they did not know whether the two suspects who had left the room were the only remaining people involved in the exchange.   *United States v. Jackson*, 700 F.2d 181, 190 (5th Cir. 1983).   In still another decision, the Fifth Circuit held that where the defendant was arrested just outside of his home, a protective sweep was permissible to dispel the possibility that another individual was inside the home who might pose a threat to the officer's safety.   *United States v. Stout*, 339 Fed. App'x. 377, 378 (5th Cir. 2009) (citations omitted).   Finally, the Fifth Circuit found no Fourth

27

Amendment violation where officers decided to conduct a sweep of a storage unit to allay their "concern" that someone else might be hiding there, even though the defendant was arrested outside of the storage unit.   *United States v. Charles*, 469 F.3d 402, 406 (5th Cir. 2006).

While Gilbert himself was not physically present at the home, the totality of the facts and circumstances support a finding that the deputies had a reasonable, articulable suspicion that 100 Dixie Drive potentially harbored an individual who could pose a danger to the on-scene officers. *Thurman*, 21-2022 WL 2805147, at *4.

As for the remaining requirements for the sweep, the Court finds that the sweep was limited to areas where an individual could have hidden and lasted no longer than necessary.   The deputies' inspection was limited to rooms and closets where someone could be present.   (Tr. 91).   In fact, they did not even peer under at least one bed because it was too low for anyone to hide beneath it.   (Tr. 86-87, 91).   The sweep lasted fewer than two minutes, and the deputies exited the home upon completion.   (Tr. 63).   Of course, while checking a closet for individuals, Deputy Purvis observed a methamphetamine bong sitting on the shelf, in plain view.   (Tr. 27, 63-64, 76).   Armed with this additional evidence, the deputies applied for a search warrant.   *See* discussion, *infra*.

In the end, where, as here, reasonable minds could differ as to whether the sweep was warranted, the Court will "not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation."   *Thurman*, 2022 WL 2805147, at *3 (quoted source omitted).   Therefore, the Court finds that the protective sweep did not transgress the Fourth Amendment.

## VI.    The Search Warrant

Gilbert contends that the application Deputy Peters submitted to obtain a search warrant for 100 Dixie Drive included a reference to evidence that was fruit of the poisonous tree, i.e., a product of the alleged unlawful protective sweep of the residence.    However, the undersigned has determined that the protective sweep did not violate the Fourth Amendment.    *See* discussion, *supra*.

Gilbert further argues that the search warrant affidavit for 100 Dixie Drive included at least one false statement, intentionally made or with reckless disregard for the truth.    The Fifth Circuit has recognized that,

> [u]nder the Supreme Court's decision in *Franks*, a search warrant must be voided if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause.

*United States v. Ortega*, 854 F.3d 818, 825 (5th Cir. 2017) (citing, *inter alia*, *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

Typically, a motion to suppress evidence discovered pursuant to a search warrant is analyzed under a two-step process.    *United States v. Sibley*, 448 F.3d 754, 757-758 (5th Cir. 2006) (citation omitted).    First, the court must decide whether the good-faith exception to the exclusionary rule applies.    *Id*.[12]    If this good faith exception applies, then the inquiry ends.

---

[12] "'The good-faith exception provides that where probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be excluded.'"    *Sibley*, 448 F.3d at 757 (quoting *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002)).    Because the exclusionary rule is designed to deter misconduct rather than to punish the errors of judges and magistrates, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant relied on it in good faith."    *United*

*Gibbs*, 421 F.3d at 357 (citation omitted).   If the good-faith exception does *not* apply, then the court must proceed to the second step of the analysis to determine whether the warrant was supported by probable cause.   *Gibbs*, 421 F.3d at 357.

In *Ortega*, the Fifth Circuit explained that the *Franks* inquiry effectively consists of three questions, all of which must be met:   "First, does the affidavit contain a false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?"   *Ortega*, 854 F.3d at 826 (internal citations omitted).

Under a *Franks* analysis, "material omissions are treated essentially similar to claims of material misstatements."   *United States v. Gonzalez*, Civ. Action No. 18-0482, 2018 WL 6174202, at *7 (S.D. Tex. Nov. 7, 2018), *R&R adopted,* 2018 WL 6173724 (S.D. Tex. Nov. 26, 2018) (citations omitted).   Moreover, the defendant must show more than mere "negligence or innocent mistake" by the affiant.   *United States v. Ortega*, 719 Fed. App'x. 319, 323–24 (5th Cir. 2018) ("*Ortega II*") (citations omitted).   However, "recklessness may be shown circumstantially 'when reasons to doubt [the] information's veracity are obvious.'"   *Id*., at 324-25 (citations omitted).

Finally, probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).   A magistrate requires only a substantial basis for concluding that a search

---

*States v. Gibbs*, 421 F.3d 352, 357 (5ᵗʰ Cir. 2005) (citation omitted).   The government bears the burden of demonstrating that the good faith exception applies.   *United States v. Gant*, 759 F.2d 484, 487 (5ᵗʰ Cir. 1985).

will uncover evidence of wrongdoing. *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citation omitted). Relatedly, "[w]hen an affiant relies upon information obtained from an informant, the affiant must provide sufficient information to allow the magistrate to determine, by reviewing the totality of the circumstances, whether the informant's information is sufficient to create probable cause." *United States v. Brown*, 567 Fed. App'x. 272, 282 (5th Cir. 2014) (citation omitted).

Gilbert contends that Deputy Peters incorrectly stated in his affidavit that, "[d]eputies were invited inside by the homeowner." The Court agrees. *See* discussion, *infra*. However, that fact does not render the resulting search warrant invalid. There is no evidence that Peters intentionally or recklessly included the misstatement in the affidavit. Peters was not even present at 100 Dixie Drive when Hosea made the gesture purportedly inviting the deputies inside the home. Moreover, later in the application, Peters plainly disclosed that, "[d]eputies requested but were denied consent to search the residence by the owner." In addition, the error was not material to the warrant application because deputies did not require an invitation or consent from the homeowner to conduct a protective sweep. *See* discussion, *supra*. In other words, once the misstatement is excised from the affidavit, the remainder of the affidavit provides probable cause for the search.[13]

The ultimate question presented by the good faith exception is "whether the magistrate so

---

[13] Although unnecessary for purposes of this decision, the Court observes that even if the reference to the bong discovered during the protective sweep is excised from the affidavit, there likely still is probable cause for issuance of the search warrant based on the anonymous tips from confidential sources stating that Gilbert was selling and/or using illegal narcotics at 100 Dixie Drive, which deputies corroborated when they stopped Gilbert with large quantities of drugs, together with his admission that he lived at that residence.

obviously erred that any reasonable officer would have recognized the error." *Messerschmidt v. Millender*, 565 U.S. 535, 556 (2012).   This Court is unable to conclude that any reasonable officer would have recognized the error.   Furthermore, there is no suggestion that the officers and judge conspired together to issue a deficient warrant.   Consequently, "even if the warrant in this case were invalid, it was not so obviously lacking in probable cause that the officers can be considered 'plainly incompetent' for concluding otherwise." *Messerschmidt*, 565 U.S. at 556.

In sum, the Court finds no constitutional violation associated with the application for, and the issuance of the search warrant for 100 Dixie Drive.

<u>**Conclusion**</u>

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 34] filed by Defendant Bob Gilbert, Jr. be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 9th day of December, 2025.

_____
KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE